IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LUIS VASQUEZ, DAVID GREENWOOD,
JAVIER SALAZAR, JULIAN LOPEZ
and ANTHONY RIACH,

                    Plaintiffs,

       v.

DANIEL BRAEMER, DON STRAHOTA,
WILLIAM POLLARD, PAMELA ZANK
and MICHAEL THURMER,

                    Defendants.

OPINION and ORDER

11-cv-806-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This is a group civil action for monetary and injunctive relief brought under 42 U.S.C. § 1983 by plaintiffs Luis Vasquez, David Greenwood, Javier Salazar, Julian Lopez and Anthony Riach regarding the allegedly harsh conditions of administrative confinement at the Waupun Correctional Institution.  Plaintiffs contend that defendants Daniel Braemer, Don Strahota, William Pollard, Pamela Zank and Michael Thurmer acted with deliberate indifference to plaintiffs' health and safety by subjecting them to conditions of confinement that deprived them of basic human needs, exacerbated their mental illnesses and caused them to experience numerous physical health problems.

Defendants have filed a motion for summary judgment, in which they contend that plaintiffs have not adduced evidence that their conditions of confinement were

1

unconstitutional or that defendants were aware that the conditions posed a serious risk of harm to plaintiffs.  Dkt. #56.  Plaintiffs responded initially by filing a motion to stay briefing so that they could obtain declarations from other prisoners who were confined in the segregation unit at the Waupun Correctional Institution.  Dkt. #67.  They also asked that briefing on the motion be stayed pending the court's ruling on plaintiffs' pending motions regarding discovery issues and for appointment of counsel or a medical expert.  Id.; dkt. #68.  Subsequently, after receiving two deadline extensions, plaintiffs filed a brief in opposition to defendants' motion, responses to defendants' proposed findings of fact, additional proposed findings of fact and supporting evidence, including several declarations from other prisoners.  After defendants filed their reply brief, plaintiffs filed a motion for leave to file a sur-reply, along with a brief and additional evidence.  Dkt. #98.

As discussed below, I am denying plaintiffs' motion for appointment of counsel or an expert and am denying plaintiffs' motion regarding discovery issues.  I am also denying plaintiffs' motion for additional time to respond to defendants' motion for summary judgment.  However, I will consider plaintiffs' sur-reply and the evidence they filed after their deadline.

Although plaintiffs' arguments about the problems that can arise when mentally ill inmates are housed in isolation with little human interaction or sensory stimulation are ones that elicit sympathy and concern and although there is undoubtedly room for improvement of the conditions of confinement in administrative segregation at the Waupun Correctional Institution, I will grant defendants' motion for summary judgment because liability under

2

the Eighth Amendment requires a showing that defendants consciously disregarded substantial risks of serious harm to plaintiffs.  In this case, plaintiffs have not shown that the conditions of administrative confinement deprived them of basic human needs or posed risks of serious harm to them.  Moreover, plaintiffs have not shown that even if they had been so deprived or were at risk of harm, defendants were aware of the harm or deprivation. Therefore, defendants cannot be held liable under the Constitution.

## DISCOVERY ISSUES

As part of their motion to stay summary judgment proceedings, plaintiffs asked that defendants be compelled to respond to certain discovery requests.  Dkt. #67.  However, after reviewing the specific discovery requests, I conclude that defendants' responses were justified.  In particular:

- Plaintiffs asked defendants to identify the dates and times that plaintiff Vasquez left his cell during the time he was in segregation.  Defendants refused on the ground that the request was overly broad and burdensome because Vasquez has been on some type of segregation status for most of his incarceration, starting in January 2000.  Dkt. #67-3 at ¶ 1.  This response is reasonable.  Moreover, it is undisputed that inmates on segregation do not leave their cells very often, so this information would not create any genuine factual dispute relevant to defendants' summary judgment motion.

- Plaintiffs asked defendants to admit that plaintiffs took certain medications or had certain medical conditions, and defendants responded on the grounds that they lacked knowledge about plaintiffs' medical conditions.  Id. at ¶¶ 13-16, 28-30; dkt. #67-4 at ¶¶ 14-15.  Plaintiffs object to this response, but defendants are not medical providers and did not have access to plaintiffs' medical records.

- Plaintiffs asked defendants to produce medical records, records related to their confinement in administrative segregation and photographs of the institution.

Dkt. #67-3 at ¶¶ 7-10, 12-15.  Plaintiffs also asked defendants to admit to certain facts about the physical layout of the segregation unit.  Dkt. #67-4 at ¶¶ 6, 10, 12.  Defendants responded that plaintiffs could make an institution request to review their own medical records, social services files and legal files.  With respect to the photographs, defendants responded that no such photographs existed.  These responses are reasonable, as defendants are required only to make records available to plaintiffs, not to provide copies of records or create photographs.  Further, because there is no dispute between the parties about the layout of the segregation unit, photographs would not have created a genuine factual dispute material to defendants' motion for summary judgment.  Defendants' objections to the request for admissions related to the physical layout of the segregation unit are also immaterial to the summary judgment disputes.

Plaintiffs also argued that they needed additional time to obtain declarations from other inmates who were housed in the segregation unit at the Waupun Correctional Institution.  However, in addition to their own declarations, plaintiffs submitted declarations from eight inmates, describing conditions of confinement in segregation.  Plaintiffs do not explain what additional information could be provided through inmate declarations or how that information would be relevant to the disputed issues in this case.  As explained already, the parties have no material dispute about the conditions of confinement in segregation.  Rather, as discussed later in this opinion, this case boils down to whether plaintiffs can prove that particular conditions caused them to suffer physical and mental distress and whether defendants understood those facts, but ignored them.  Plaintiffs do not suggest that any other inmate declaration would have bearing on these issues.

MOTION FOR ASSISTANCE IN RECRUITING COUNSEL OR EXPERT

In response to defendants' motion for summary judgment, plaintiffs filed a renewed

motion for assistance in recruiting counsel or in the alternative, a motion for appointment of an impartial medical expert.  Dkt. #68.  Plaintiffs' primary argument is that they need a medical expert to respond adequately to defendants' arguments and to prevail on their claims, but they cannot afford one.  Plaintiffs argue that if the court helped them to find a lawyer, the lawyer could find a medical expert to testify on plaintiffs' behalf.   In the alternative, the court could simply find a medical expert to testify about the issues in this case.

Litigants in civil cases do not have a constitutional right to a lawyer.  Nonetheless, as Magistrate Judge Crocker explained to plaintiffs previously, the court would appoint a lawyer to almost every pro se plaintiff if lawyers were available to take the cases.  This court handles more than 200 new pro se lawsuits every year, but there are many fewer lawyers who are willing and qualified to accept a pro bono assignment to a prisoner lawsuit.  As a result, I have no choice but to limit recruitment of counsel to those cases in which it is clear under the applicable legal test that the plaintiff must have the assistance of a lawyer.  To determine whether assistance in recruiting counsel is appropriate in a particular case, courts must review the record and consider whether the legal and factual difficulty of the case exceeds the plaintiffs' demonstrated ability to prosecute it.  Pruitt v. Mote, 503 F.3d 647, 654 (7th Cir. 2007).

Because this is a multi-plaintiff case dealing with questions about the relationship between conditions of confinement and physical and mental health, it is relatively complex. Nonetheless, plaintiffs have shown themselves throughout this case to be capable advocates

5

for themselves.  In fact, plaintiffs' submissions are on par with submissions I have seen from licensed attorneys in cases of similar complexity.  Plaintiff Vasquez in particular has had substantial experience litigating cases in this court, including representing himself in three jury trials, Vasquez v. Raemisch, 06-cv-743-bbc; Vasquez v. Hilbert, 07-cv-723-slc; Vasquez v. Nickel, 07-cv-724-bbc, and has demonstrated his ability to understand court procedures, gather and present evidence and respond coherently to legal arguments.  Plaintiffs engaged in discovery and managed to submit an impressive amount of evidence regarding their conditions of confinement and their mental and physical health.  They responded properly to defendants' proposed findings of fact and prepared their own proposed findings following this court's procedures and supported by declarations and exhibits.  Their legal arguments are logical, well researched and supported by up-to-date legal citations and their submissions demonstrate that they have a clear grasp of the relevant legal and factual issues.  Nothing in the materials indicates that plaintiffs suffer from mental deficiencies that have affected their ability to litigate this case.  Although plaintiffs struggled to comply with the court's deadlines, they were afforded numerous deadline extensions and I have considered all of plaintiffs' evidence and arguments, including those that were untimely.

The real issue is not that plaintiffs are incapable of prosecuting this case on their own, but that plaintiffs cannot afford to pay for an expert to testify on their behalf.  Plaintiffs are correct that having an expert to testify for them could have made their claims stronger and may have helped them at the summary judgment stage.  This is true in most prisoner cases involving medical or mental health care.  However, the court of appeals has never held that

it is appropriate to appoint counsel simply to shift the burden of finding and paying for an expert from plaintiffs to counsel.  Further, there is no guarantee that counsel could have found an expert to offer opinions favorable to plaintiffs.  As discussed later in this opinion, plaintiffs needed expert testimony to prove that their conditions of confinement caused the specific physical and mental health problems about which they complain and that changes to the conditions of confinement would have made a difference to plaintiffs' health.  Counsel may or may not have been able to find an expert to offer such opinions; regardless, I decline to appoint counsel on that basis.  And, although the court may have the power to appoint an expert at defendants' expense in a particular case, <u>Ledford v. Sullivan</u>, 105 F.3d 354, 361 (7th Cir. 1997), I am not persuaded that it would be appropriate to do so in this case because plaintiffs have not shown that they tried and failed to obtain an expert and it is not clear from the record that an expert would substantially aid the court in adjudicating this matter.  (Notably, expert testimony would not have been particularly useful with respect to the deliberate indifference element of plaintiffs' claim, which focuses on defendants' subjective intent.)  Therefore, I am denying plaintiffs' motion for appointment of counsel or for recruitment of an expert.

From the parties' proposed findings of fact and the record, I find the following facts to be material and undisputed.

## UNDISPUTED FACTS

### A. The Parties

The five plaintiffs in this action, Luis Vasquez, David Greenwood, Javier Salazar, Julian Lopez and Anthony Riach, are all inmates of the Wisconsin Department of Corrections.  At times relevant to this action, they were all housed on administrative confinement in the segregation unit at Waupun Correctional Institution.

Defendant Michael Thurmer was the warden at Waupun until January 5, 2011. Defendant William Pollard replaced him in April 2011.  Defendant Donald Strahota was the Waupun security director; he has been the Waupun deputy warden since August 28, 2011. Defendant Pamela Zank was the Waupun corrections program supervisor. Defendant Daniel Braemer is a Waupun lieutenant responsible for assisting in the coordination of all security operations in Waupun's segregation unit.  None of the defendants are physicians or psychologists and none are qualified to provide psychological services to inmates.

### B. Administrative Confinement

Administrative confinement is an involuntary, nonpunitive, segregated status assigned to inmates that are believed to be incapable of living in general population.  Regulations relating to administrative confinement are set forth in § DOC 308 of the Wisconsin Administrative Code.  Under the regulations, inmates can be placed in administrative confinement if an administrative confinement review committee determines that the inmate's "continued presence in general population poses a serious threat to life, property,

self, staff, or other inmates, or to the security of the institution." Wis. Admin. Code. DOC § 308.01.  The committee consists of three members appointed by the warden: one from security staff, one from treatment staff and a supervisor.

Generally, an inmate is reviewed for possible administrative confinement assignment when he is transferred into the prison and when he is nearing the end of a term of disciplinary segregation.  If the security director believes that an inmate's behavioral history meets the criteria for placement in administrative confinement, he assigns the program lieutenant to conduct the review.  If the lieutenant concludes that the inmate should be placed in administrative confinement, he can make a recommendation to the administrative confinement committee which will, in turn, determine whether administrative confinement is necessary.  An inmate is placed in administrative confinement if the committee members agree unanimously on the placement.  If the committee members are not unanimous, the warden makes the final decision.  Inmates have the right to appeal the committee's decision to the warden.

The committee is required to review an inmate's progress in administrative confinement at least every six months and the committee and warden must review the confinement decision at least every 12 months.  The committee may make recommendations regarding possible release from administrative confinement on the basis of positive behavior, including a lack of major conduct reports, participation in the in-cell New Freedom Program and participation in individual and group therapy.

At the Waupun Correctional Institution, inmates are placed on administrative

9

confinement without regard to the inmate's mental health history or status and without contacting mental health professionals for input or recommendations. Additionally, an inmate's administrative confinement may be continued without consideration of their mental health status. The psychological services unit and health services unit sometimes provide information to security staff relating to inmates in segregation. A segregation review team consisting of the program supervisor, available psychological services staff, a health services staff member, a social worker and available unit staff meets almost every week to discusses inmates in the segregation unit with mental health or behavioral issues. The team reviews the status of each inmate in segregation at least once a month and makes recommendations as to the inmate's status.

## C. Conditions in the Segregation Unit

The Waupun Correctional Institution has one segregation unit that houses approximately 180 inmates. Inmates on administrative confinement status are housed in the segregation unit. In addition, the segregation hall houses inmates on adjustment segregation, controlled segregation, disciplinary separation, observation status, program segregation, protective confinement and temporary lockup status.

Inmates in the segregation unit are frequently confined to their cells for 23 or 24 hours a day. The cells in the segregation unit are approximately 66 square feet, with three brick walls and a sliding steel door. The door has a small trap through which trays and medication are passed and one observation window, approximately 5 1/4 inches by 18

10

inches, that provides a limited view of the hall outside the door. In the hall outside the cell door, a concrete wall runs down the center of the segregation wing, with intermittent breaks in the wall. The wall is designed to reduce noise and to prevent the transfer of contraband and has the effect of limiting inmates from seeing and communicating with other inmates in the unit.

The only fixtures in the cells are a concrete structure on which a mattress is placed, a concrete shelf that provides a writing surface, a stainless steel sink and toilet. The cell also has an intercom for emergency situations. Mounted on the wall is a polished wall plate that is used as a mirror. Every cell has a window that is approximately 5 inches by 37 inches. Until 2011, the windows were frosted glass that prevented plaintiffs from viewing the outside environment and allowed in little natural sunlight or warmth. In 2011 the windows were replaced with clear windows that allow the inmate a view of the outside and sunlight to enter the cell. The light fixture in the cell has four fluorescent tubes, with one 5-watt light that is illuminated at all times for safety and security purposes.

Movement, property and privileges are highly controlled. Inmates are strip searched prior to coming into segregation and before going into observation or control status to insure they have no contraband or items that could be used to cause disruption or self harm. Prison staff members inspect mail, search cells frequently and conduct daily rounds of the segregation unit to make sure inmates are visible and not causing self harm. Prisoners in the segregation unit have only limited opportunities to leave their cells. They can leave for a shower two times a week, can attend recreation up to four hours each week and can leave

11

their cells for group activities and programs, medical appointments, visits and legal study. Inmates can participate in out of cell programming and counseling, though there can be a long waiting list for certain programs. Each time an inmate leaves his cell, he must be wear restraints and must be escorted by prison officers.

Inmates are allowed and encouraged to exercise in their cells, and the segregation handbook outlines an in-cell fitness program for inmates. Inmates are also encouraged to take part in recreation outside the cell when it is offered, but inmates in segregation cannot engage in outdoor or group recreation. Instead, recreation for inmates in segregation takes place in a specific segregation recreation area that contains six recreation cells, varying in size from approximately 9 feet x 6 feet to 6 1/2 feet x 12 feet. The cells have openings toward the top that are covered with wire and allow in natural light and air. They are not heated or cooled and are subject to the weather, which means they can be very hot in the summer and cold in the winter and fall. Once the inmate is placed in the recreation cell, his restraints are removed and the inmate gets an hour of recreation, up to four times a week. Before 2011, the cells had no exercise equipment. Starting sometime in 2011, the cells were equipped with a dip bar, pull up bar, an apparatus for doing knee raises, hacky sacks and basketballs. Some inmates have difficulty using the exercise equipment because of physical or mental health conditions or because they believe their shoes do not provide them adequate support. Inmates can communicate with each other during recreation, although social communication and interaction can be difficult when there are loud and disruptive inmates in the recreation cells.

Inmates in segregation have very little human contact.  They are not allowed outside the segregation building unless they have court appearances or off-site medical appointments.  They may be able to see prison personnel when meal trays, medications and daily supplies are handed out and when staff walk by cells to transport other inmates, but prison officials rarely communicate with the inmates in segregation at such times.  Inmates may interact with officers conducting rounds and may communicate with prison staff if they are having a medical problem.  However, it can be difficult to communicate with staff because the segregation unit is often noisy, with inmates kicking and pounding on cell doors, engaging in loud conversations, screaming,  whistling and arguing for long periods of time.  Inmates on administrative confinement status are allowed one ten-minute call each week and four two-hour video visits each month. They are not allowed contact visits.  The visitation in the segregation unit consists of the inmate sitting in a booth watching a television monitor while the visitor is in a booth in the visit center watching a television monitor.  Inmates are allowed to correspond in writing with family and friends.

Inmates in segregation may request "legal recreation" once a week.  Legal recreation takes place in the segregation electronic law libraries, where the inmate is tethered with a short strap to a metal table and directed to sit and remain seated on a metal stool.  Only one inmate is allowed in the law library at a time.

Inmates in segregation are subject to limits on the amount and type of property they can keep in their cells.  They may possess hygiene products, canteen items, clothing, bedding, legal property, reading materials, religious items and certain personal items such

as eyeglasses, a wedding ring and photography.  All inmates except those on observation or control status receive socks, underwear, a T-shirt, orange pants and shirt, a face cloth, hand towel, sheets and blankets.  They are all provided the same canvas slip-on shoes with rubber soles.  These shoes are not stiff or bulky, so they are easily searchable and are less likely to injure staff.  They also have no laces, which reduces the risk that an inmate will use laces to harm himself.  However, some inmates find that the shoes provide inadequate support for certain exercises.  Inmates in segregation are given clean undergarments, shirts and socks at least twice a week.  Some inmates choose not to exercise everyday because they do not want to soil their clothes.  Inmates may posses three library books at a time and three grocery bags of legal and other paperwork.  Inmates on administrative confinement may possess the maximum amount of property allowed in segregation.  Medical requirements can alter property allowances.  For example, if an inmate needs an insert or a different kind of shoe for medical reasons, the health services unit can fill out a special needs form.

Staff working in the segregation unit receive crisis intervention training and the prison has policies regarding how staff should respond to incidents of self -harm.  An inmate may be placed in observation status when he threatens or engages in self-harming behavior.  While in observation an inmate is closely monitored by security and psychological services unit staff.

D.  Plaintiffs' Administrative Confinement

1.  Plaintiff Louis Vasquez

Plaintiff Vasquez was housed in segregation at the Waupun Correctional Institution from December 20, 2002 to December 2, 2011.  Vasquez was held on administrative confinement status nearly continuously from December 14, 2007 until November 29, 2011, with some breaks during times in which he was on "adjustment segregation" status. Defendant Braemer recommended administrative confinement initially because Vasquez is serving a life sentence for violent offenses and had received 14 major conduct reports in prison for offenses including conspiracy to commit a riot and physical assaults of prison staff and other inmates.  The administrative confinement review committee and Wardens Thurmer and Pollard agreed that Vasquez posed too great a risk to others to be housed in general population.  Neither Braemer, the committee nor the wardens considered Vasquez's mental health when reviewing his conduct reports or his placement on administrative confinement.  Vasquez's placement was reviewed periodically by the committee and segregation review team and the placement was continued on several occasions.

Vasquez has a history of serious mental illness and has diagnoses of "psychogenic disorder," anxiety disorder with some symptoms of post-traumatic stress disorder and a major depression disorder for which he received anti-depressant medication throughout his time on administrative confinement.  Dkt. ##76-1, 76-2.  In October 2009, Vasquez attempted to hang himself in his segregation cell using dental floss.  He ended up falling on the floor and hitting his head on the brick wall.   He then began biting himself and called

15

staff. Dkt. #76-4 at 2. He was taken to Waupun Memorial Hospital for medical treatment and was placed on observation status upon his return.

Vasquez told his doctors on several occasions that his status in administrative confinement was exacerbating his depression and making him feel unmotivated. He told this to Dr. Gene Braaksma during a psychological appointment in March 2010 and to Dr. Todd Callister during appointments in September and November 2010. Dkt. #76-1 at 3; Dkt. #76-2 at 3-4. He also told Dr. Braaksma that the lack of exercise opportunities was causing him pain in his joints and he told Callister that he was feeling suicidal. Dkt. #76-1 at 3. On May 23, 2011, Vasquez told Dr. Ryan Tobiasz during a psychological appointment that his lengthy administrative confinement placement was causing him stress and depression and was making it difficult to sleep or enjoy life. Id. at 4. Vasquez told his doctors that his family did not want to visit him because they did not like seeing him through a video screen.

Vasquez also told defendants on several occasions that he believed administrative confinement was having negative affects on his physical and mental health. In March 2010, he wrote to the segregation review team and to defendant Braemer, asking them to release him from segregation at his upcoming review before the administrative confinement committee. He stated in his letters that his prolonged confinement in the segregation setting was exacerbating his mental illness, interfering with his mental health treatment and causing him serious physical harm, diseases and functional impairment. Dkt. #76-5 at 1-4. After the administrative confinement committee decided to continue his administrative confinement, Vasquez wrote Braemer again, in May 2010, stating that the decision was

16

exacerbating his mental illness, causing him extreme mental and emotional distress and depression, anxiety, hopelessness and suicidal thoughts. He asked Braemer to transfer him to the behavioral health unit so that he could receive better mental health treatment. Id. at 5.

On November 3, 2011, prison psychologist Dr. Braaksma wrote to the administrative confinement committee to provide an "update on his work" with Vasquez. Dkt. #99-2. He stated that Vasquez had been an active and positive member of a "seg monitoring group" and had been working on the "New Freedom" materials. Id. On May 11, 2011, Dr. Braaksma sent another update to the committee, stating that Vasquez had completed the New Freedom materials, continued to participate in the clinical monitoring group and "show[ed] consistent, positive behaviors." Id. at 3.

On June 14 and 15, 2011, Vasquez wrote defendants Pollard, Strahota and Braemer, stating that it was unconstitutional to house mentally ill inmates in administrative confinement for indefinite terms and that the lack of adequate mental health care, exercise, sunlight, visits, personal property and socialization had exacerbated his mental illness and physical health problems and caused him major depression and suicidal thoughts. Dkt. #76-5 at 7-11. He asked that he be released from administrative confinement and also asked Pollard to institute new policies that would require mentally ill inmates on administrative confinement to be housed in the behavioral health unit or the north cell hall. Id.

On June 17, 2011, defendant Pollard responded to Vasquez's letter by stating that Vasquez should use the inmate complaint procedures if he wished to complain about

17

conditions of his confinement.  Defendant Strahota responded on June 27, stating that he was not responsible for processing appeals of administrative confinement placement and that the Wisconsin Administrative Code dictated administrative confinement placement rules. Defendant Braemer did not respond.

On July 17, 2011, Vasquez told staff he was going to kill himself because he was upset that defendant Pollard had denied his appeal of administrative confinement and he would rather die than live another day in segregation.  Staff called for help and at the same time, Vasquez looped dental floss around his neck, tied it to the vent and jumped from his sink. The floss broke and Vasquez fell to the floor.  Vasquez then swallowed a tube of antifungal cream.  Staff entered the cell and placed Vasquez on observation and suicide watch.  Dkt. ##76-1 at 5; 76-4 at 5.  Vasquez met with Dr. Callister a couple of days later and told Callister that he was disappointed his suicide attempts were unsuccessful and that he was still feeling suicidal because of his stay in segregation.  Dkt. #76-2 at 5.  Vasquez also told Dr. Callister that he felt "worthless, lonely, unloved, depressed and suicidal all the time." Id.

On August 8, 2011, Vasquez sent defendant Braemer an information request form, complaining that his ongoing administrative confinement status and the conditions of segregation were affecting his mental and physical health.  Dkt. #76-5 at 17.  He asked the segregation review team to remove him from administrative confinement and place him in the behavioral health unit.  Braemer responded that the segregation review team "does not recommend removal . . . it is not our place to do so."

18

Vasquez met with Dr. Callister again on November 3, 2011, and Dr. Callister noted that Vasquez was doing poorly, felt depressed and hopeless and had lost interest in exercising and staying healthy because of his life sentence and prolonged stay in segregation. Dkt. #76-2 at 6. Dr. Callister noted that Vasquez's depression appeared to be "largely situational." Id. That same day, Dr. Callister sent a memorandum to defendant Braemer stating, "I see Mr. Vasquez monthly in psychiatric appointments. He continues to exhibit depression, which is largely situational. It is my opinion that at this time his status in administrative confinement is detrimental to him from an emotional standpoint. I believe it is likely that confinement in a less restrictive setting would be of benefit to him psychologically." Id. at 7. On November 9, Braemer recommended to the administrative confinement committee that Vasquez remain in administrative confinement because of his history of disruptive and assaultive behavior. The committee agreed and recommended continued administrative confinement, but on review, defendant Warden Pollard disagreed, noting that Vasquez's behavior had improved and he had participated in programs while in administrative confinement. On November 29, 2011, Pollard released Vasquez from administrative confinement.

Vasquez had difficultly transitioning to general population and in January 2012 his treating psychologist recommended that he be transferred to Wisconsin Resource Center for treatment. Dkt. #76-1 at 8. He was transferred to Wisconsin Resource Center in April 2012. Later that month, he was placed in general population at Waupun. He is currently back in segregation after being found guilty of battery.

19

2.  Plaintiff David Greenwood

Plaintiff David Greenwood is housed in general population at the Waupun Correctional Institution.  He was housed in segregation from August 2009 until December 2011, and was held on administrative confinement status from September 28, 2010 until December 7, 2011, with one interruption for disciplinary segregation.  Defendant Braemer recommended the initial placement in administrative confinement because of Greenwood's long sentence for a violent crime and history of physical assaults of inmates and threats to assault prison staff.  The administrative confinement review committee agreed that Greenwood's presence in general population posed a risk to others and to institution security.

Plaintiff Greenwood has a history of mental illness and has diagnoses of adjustment disorder, impulse control disorder and antisocial personality disorder.  Dkt. ##86-2, 86-3.  He received medication for his mental disorders during his time in administrative confinement.  On January 7, 2010, while he was housed in segregation, Greenwood tied a sheet around his neck, stood on top of the sink and yelled, "I'm going to commit suicide, I got a noose around my neck."  Staff entered his cell and placed him in observation.  Dkt. #86-1 at 1-2.

During his psychological appointments, Greenwood expressed frustration and depression regarding his placement in administrative confinement.  Dkt. #86-2 at 2.  On December 23, 2010, during a psychiatric appointment with Dr. Callister, Greenwood reported that he was doing poorly, was upset and frustrated because of his administrative

confinement and that he was having thoughts of harming himself. Dr. Callister noted that Greenwood's mood was angry and stated that "most of his reported symptoms are related to a lengthy segregation stay." Dkt. #86-3.

On March 30, 2011, Greenwood covered his window, put his mattress against the door, tied his bed sheet into a noose and placed it around his neck, threatening to strangle himself. Staff intervened and moved Greenwood to an observation cell. Dkt. #86-1 at 8-9. He met with psychological services that same day and told Dr. Braaksma that he was frustrated with his continuation in administrative confinement and had decided life was not worth living. Dkt. #86-2 at 1.

At a psychiatric appointment on September 1, 2011, Greenwood told Dr. Callister that segregation was "really getting to [him]," that he was tense and upset all the time, frequently had aggressive thoughts, sometime thought of suicide and was having difficulty maintaining good behavior. Dr. Callister noted that Greenwood was "having difficulty adjusting to what has become a lengthy [administrative confinement]. He has limited coping skills and characterological traits are likely amplified in the isolated environment of seg." Dkt. #86-3 at 2.

3. Plaintiff Javier Salazar

Plaintiff Javier Salazar was held in administrative confinement from December 23, 2008 until November 11, 2011, with two interruptions for disciplinary and program segregation. Defendant Braemer recommended the placement because of Salazar's long

21

sentence for a violent crime, conduct history, his leadership role in the Latin Kings street gang and his attempts to start a pyramid scheme while he was incarcerated.

Plaintiff Salazar has diagnoses of obsessive compulsive disorder, adjustment disorder with depressed mood and antisocial personality disorder and he has received medications for his disorders while in administrative confinement.  Dkt. #88-1.  He has suffered from mental health problems since at least 2004.  Dkt. #99-4.  On July 28, 2011, Salazar submitted an information request asking why he was being housed in punitive conditions and why prisoners with mental illnesses were being housed in segregation cells.  Id.  Defendant Braemer responded by stating that Salazar should "contact the security director."  Id.  In September 2012, Salazar was transferred to the Wisconsin Resource Center for treatment and help with transition to general population.

4.  Plaintiff Julian Lopez

Plaintiff Julian Lopez has been on administrative confinement status from May 2010 until the present and has resided on the Waupun segregation unit continuously since March 10, 2009.  Defendant Braemer recommended placing Lopez on administrative confinement initially because of his long sentence for violent crimes, history of assaulting other inmates and his leadership involvement in the Spanish Cobras gang that included placing a hit on another inmate.   He has remained on confinement status in part because he has not participated in any groups or treatment programs and the committee concluded that he appeared unmotivated to change his behavior.

Lopez has a diagnosis of a major depressive disorder and received medication to treat his depression before and during administrative confinement.  Dkt. ##87-1; 87-2.  At a psychiatric appointment on April 18, 2013, he told Dr. Callister that he was not doing well and that administrative confinement was getting to him.  He also said he had suicidal thoughts and anxiety attacks.  Dkt. #87-2.

5.  Plaintiff Anthony Riach

Plaintiff Anthony Riach is housed at the Wisconsin Resource Center.  He was held in administrative confinement at the Waupun prison from April 21, 2010 until November 7, 2012.  Defendant Braemer recommended the placement because Riach was serving a life sentence and had received more than 30 conduct reports, including ones for threatening to kill or injure staff members and mailing an unknown powder to the Waukesha County District Attorney's Office.

Plaintiff Riach had diagnoses of major depressive disorder, social phobia, polysubstance abuse and antisocial personality disorder before his administrative confinement status and he received medication and treatment for his mental health problems during administrative confinement.  Dkt. #88-3.  On August 3, 2011, Riach submitted information requests asking why he was being held in administrative confinement for so long when he should be housed in a special management unit where he could receive better treatment for his mental illnesses.  Dkt. #99-4.  He also asked why he was not allowed outdoor recreation and stated that he was more depressed than he had been in a long time.

23

Id.  On August 15, 2011, Riach submitted an information request again asking why he was being denied outside recreation and stating that he needed more exercise opportunities.  Id. (The responses Riach received are nearly illegible, but it appears that defendant Braemer responded to the information requests stating that "[r]ecreation is given to where you are housed," and "PSU files [psychological services unit] not for seg hearing."  Id.)  In a letter written on March 22, 2012, prison psychologist Dr. Braaksma wrote a letter to the administrative confinement committee regarding an upcoming evaluation of Riach's placement.  Dkt. #88-3.  He wrote that Riach had been a positive influence in the administrative confinement treatment group and that Riach had "achieved maximum benefit from the programming available."  He also stated that Riach "would benefit psychologically from a transition toward General Population, possibly by way of [the behavioral health unit]" and that "[s]uch a transition would allow him to be monitored effectively during transition . . . ."  Id.  The committee decided to continue Riach's administrative confinement until he was eventually released in November 2012.  He was transferred to the Wisconsin Resource Center in November 2012 to assist with transition to general population.


OPINION

    Plaintiffs contend that defendants violated their constitutional right not to be subject to cruel and unusual punishment by housing them for prolonged periods under harsh conditions that caused them to suffer various physical health problems and exacerbated their mental illnesses.  All of plaintiffs' claims are governed by the Eighth Amendment, which

entitles incarcerated persons to confinement under humane conditions that provide for their "basic human needs." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). This means inmates must receive adequate food, clothing, shelter and medical care. Farmer v. Brennan, 511 U.S. 825, 832 (1994). Additionally, the Eighth Amendment requires prison officials to protect incarcerated persons from substantial risks of serious harm, Rice ex rel. Rice v. Correctional Medical Services, 675 F.3d 650, 669 (7th Cir. 2012), including the risk that they will suffer a mental health breakdown, engage in self-harm or commit suicide. Cavalieri v. Shepard, 321 F.3d 616, 620 (7th Cir. 2003); Jones 'El v. Berge, 164 F. Supp. 2d 1096, 1117 (W.D. Wis. 2001).

A claim that the conditions of an inmate's confinement were constitutionally inadequate has two elements. First, the prisoner must show that the adverse conditions were "sufficiently serious," to deprive the prisoner of a "minimal civilized measure of life's necessities." Farmer, 511 U.S. at 834; Chapman, 452 U.S. at 347. A condition of confinement may be serious enough to rise to a constitutional violation on its own or multiple conditions of confinement may have a "mutually enforcing effect" that results in "the deprivation of a single, identifiable human need" such as food, warmth, or exercise. Budd v. Motley, 711 F.3d 840, 843 (7th Cir. 2013) (citing Wilson v. Seiter, 501 U.S. 294, 304 (1991)). If the prisoner can show that conditions of confinement were sufficiently serious, he must then show that the prison officials were "deliberately indifferent to the adverse conditions." Rice, 675 F.3d at 665. An official is deliberately indifferent when he is subjectively aware of the condition or danger complained of, but consciously disregards

25

it. Id.

Plaintiffs complain about a number of conditions in administrative confinement, including severe restrictions on activities (recreation, showers, library, property), limited social interaction (visitation rights, segregated cells, few group activities), insufficient access to natural sunlight and the lack of opportunities for prison employment. Defendants do not deny that these conditions exist; in fact, there are no material disputes between the parties about the conditions of confinement for inmates on administrative confinement status. However, the parties do disagree about whether these conditions are sufficiently serious to deprive plaintiffs of basic human needs.

## A.  Exercise, Sunlight and Sanitation

Plaintiffs argue that the conditions of administrative confinement deprived them of access to the basic needs of exercise, sanitation and clothing, but plaintiffs have not submitted evidence to support their argument.  "Lack of exercise may rise to a constitutional violation in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened."  Antonelli v. Sheahan, 81 F.3d 1422, 1432 (7th Cir. 1996).  However, plaintiffs have failed to submit any evidence that they were denied exercise for long periods of time, that their health was threatened by their inability to exercise more or that defendants were personally responsible for any deprivation of exercise.  Although plaintiffs state that they wanted to exercise outside in the yard with other inmates, they do not deny that they were prohibited from exercising outside with others because of their past

26

behavior and do not argue that it was unreasonable for defendants to separate them from others during recreation.  Pearson v. Ramos, 237 F.3d 881, 885 (7th Cir. 2001) ("Preventing access to the yard was a reasonable method of protecting the staff and the other prisoners from [plaintiff's] violent propensities.").  Further, the evidence in the record shows that plaintiffs had opportunities for exercise.  It is undisputed that plaintiffs could attend recreation out of their cells four times a week and could engage in an in-cell exercise program as described in the segregation manual.  Although plaintiffs sometimes chose not to exercise because they did not want to soil their clothes or their shoes provided insufficient support for certain exercises or they were unmotivated, plaintiffs have not adduced evidence from which a jury could conclude that defendants deprived plaintiffs of the opportunity to exercise, particularly where plaintiffs produced no facts showing that the recreation cells were unusable, that their own cells were too small for exercise, that their shoes prevented them from performing any exercises or that they requested and were denied different shoes from their medical providers.  Compare Harris v. Fleming, 839 F.2d 1232, 1236 (7th Cir. 1988) (finding no violation where inmate was denied yard time for four weeks but could move about in his segregation cell by doing pushups, aerobics or jogging in place), with Delaney v. DeTella, 256 F.3d 679, 684 (7th Cir. 2001) (inmate stated constitutional claim after he was denied any exercise out of his cell during six-month term in segregation and his cell was too small to allow any meaningful chance to exercise).  See also Turner v. Hamblin, 12-CV-179-BBC, 2012 WL 3070684, *5 (W.D. Wis. July 30, 2012) (denying inmate leave to proceed on claim that four hours of exercise outside segregation cells violated

27

constitutional rights).

Additionally, although plaintiffs contend that they suffered myriad physical health problems because of their inability to exercise and their lack of access to natural sunlight, plaintiffs have produced insufficient evidence to support this.  Plaintiffs state in their declarations that they suffered from hypertension, hyperlipidemia, high cholesterol, poor circulation, poor concentration, obesity, inadequate bone strength, fatigue, sleepiness, headaches, constipation, Vitamin D deficiency, periodontal disease, skin problems, cysts, blood clots, physical stiffness and pain in their joints, among other things.  However, plaintiffs submitted no evidence from which a jury could conclude that these problems were related to plaintiffs' lack of exercise, limited sunlight or any other conditions of administrative confinement.  Plaintiffs submitted some medical records, including medical test results and summaries of medical checkups, but they provided no testimony from a medical professional qualified to interpret the records.  Additionally, nothing in the medical records connects plaintiffs' alleged health problems to their conditions of confinement.  For example, no treating physician has filed a statement attributing plaintiffs' physical health issues to any particular conditions of confinement.  Plaintiffs are not medical professionals, so their own beliefs about the cause of their medical issues are not admissible.  Fed. R. Evid. 702; Pearson, 237 F.3d at 886 (noting that inmate was not competent to testify about relation between exercise and dental problems); Winger v. Pierce, 11-3480, 2013 WL 1395901, *4 (7th Cir. Apr. 8, 2013) (unpublished) (affirming summary judgment in favor of defendants where inmate presented no medical evidence that his health problems were

linked to his denial of outside recreation); Gruenberg v. Schneiter, 474 F. App'x 459, 463 (7th Cir. 2012) (unpublished) (affirming grant of summary judgment in favor of defendants where inmate presented no admissible evidence linking muscle pain and depression to exercise deprivation).

Plaintiffs also have not shown that they were deprived of adequate sanitation or clothing.  Plaintiffs were permitted two showers a week.  The Court of Appeals for the Seventh Circuit has stated that limiting inmates to weekly showers does not violate the Eighth Amendment, Henderson v. Lane, 979 F.2d 466, 468–69 (7th Cir. 1992); Davenport v. DeRobertis, 844 F.2d 1310, 1316 (7th Cir. 1988), and plaintiffs have not alleged that they were prevented from washing at their sinks.  Additionally, plaintiffs have not alleged that their health was threatened because they received clean clothes only twice a week.  No reasonable jury could conclude that the frequency of the showers and clothing changes was a deprivation serious enough to amount to a constitutional violation.


## B.  Mental Health

This leaves plaintiffs' claims that their conditions of confinement collectively exacerbated their mental health problems.  In fact, plaintiffs devote most of their brief to this claim, contending that the extreme isolation, lack of social interaction and sensory deprivation, combined with the prolonged terms of their administrative confinement, worsened their existing mental health disorders and caused them to feel more depressed, hopeless and suicidal.

Prison officials have an obligation to provide for the psychiatric care of their inmates pursuant to their constitutional obligation to address their serious medical needs. Rice, 675 F.3d at 676 (citing Sanville v. McCaughtry, 266 F.3d 724, 734 (7th Cir. 2001)). Additionally, this court has explained that a prisoner's mental health or sanity is a basic human need, the deprivation of which can constitute an Eighth Amendment violation. Jones 'El, 164 F. Supp. 2d at 1117. Thus, prison officials may be found to have violated their duties under the Eighth Amendment by failing to provide treatment for an inmate's serious mental health care need or by consciously disregarding conditions of confinement that "are so severe and restrictive that they exacerbate the symptoms that mentally ill inmates exhibit." Id. at 1116. See also Farmer v. Kavanagh, 494 F. Supp. 2d 345, 366-67 (D. Md. 2007) (explaining that conditions of confinement that deprived prisoner of "mental health or sanity" may be unconstitutional); Madrid v. Gomez, 889 F. Supp. 1146, 1264 (N.D. Cal. 1995) (stating that "if the particular conditions of segregation being challenged are such that they inflict a serious mental illness, greatly exacerbate mental illness, or deprive inmates of their sanity, then defendants [prison officials] have deprived inmates of a basic necessity of human existence—indeed, they have crossed into the realm of psychological torture").

Defendants have conceded for the purposes of summary judgment that all of the plaintiffs have mental illnesses and had mental health needs during their time in administrative confinement. Additionally, defendants admit that they were aware of the conditions of confinement for inmates on administrative segregation at the Waupun Correctional Institution. However, they contend that the evidence plaintiffs have adduced

30

is insufficient to establish that the conditions of confinement in administrative segregation posed a "substantial risk of serious harm" to plaintiffs or deprived them of their mental health or sanity.  Additionally, defendants contend that even if plaintiffs could prove that particular conditions or the totality of conditions were so deleterious as to pose a substantial risk of serious harm, plaintiffs cannot prove that defendants were aware of the situation and consciously disregarded it or that defendants had any other feasible options.

With respect to plaintiffs Salazar, Lopez and Riach, it is clear that they submitted insufficient evidence from which a reasonable jury could conclude that the conditions of administrative confinement exacerbated their mental health problems or posed any risk of serious harm to them that would not have existed outside administrative confinement.  The evidence in the record shows that plaintiffs Salazar, Lopez and Riach suffered from mental health problems before they were placed on administrative confinement and that their problems continued while they were in the segregation unit.  Plaintiff Salazar had diagnoses of obsessive compulsive disorder, adjustment disorder with depressed mood and antisocial personality disorder, dkt. ##88-1, 99-4 at 2; Lopez had a diagnosis of major depressive order, dkt. #87-2; and Riach had diagnoses of  major depressive disorder, social phobia, polysubstance dependence and antisocial personality disorder.  Dkt. #88-3.  All three plaintiffs stated in their declarations that their prolonged confinement in administrative confinement caused or exacerbated their mental and emotional health problems.  Salazar Decl., dkt. #92, at ¶ 19; Lopez Decl., dkt. #87, at ¶ 8; Riach Decl., dkt. #93 at ¶ 19.  However, plaintiffs are not mental health experts and they are not qualified to offer opinions

31

about the causes of their mental or physical health problems.  Even if they were qualified, their declaration statements are too vague to support a finding that the conditions of administrative confinement caused or exacerbated their mental health issues.

Plaintiffs offer nothing beyond Salazar's own statement to support his claim that the conditions of his confinement exacerbated his mental illnesses.  With respect to Riach, the only evidence in the record that the conditions of administrative confinement exacerbated his problems is his August 3, 2011 information request stating that he felt "more depressed that [he had] been in a long time."  Dkt. #99-4.  This general statement from Riach about his depression is not sufficient to show a connection between his conditions of confinement and his mental illness.  With respect to Lopez, plaintiffs submitted records from March 2012 and April 2013 appointments Lopez had with prison psychiatrists, in which one psychiatrist noted that Lopez had "feelings of discouragement, some of which is situational," dkt. #87-2 at 2, and the other psychiatrist noted that Lopez felt hopeless and thought that "administrative confinement [was] getting to him." Id. at 3.  These statements are too vague to support a conclusion that the conditions of administrative confinement were inflicting serious suffering to Lopez, particularly because Lopez denied suicidal thoughts or any intent or plan to act on suicidal thoughts during the visits.  Id.

It is a closer question whether plaintiffs Vasquez and Greenwood have submitted evidence sufficient to allow a jury to conclude that their mental illnesses were exacerbated significantly by their conditions of confinement.  Both Vasquez and Greenwood had suicidal thoughts and engaged in suicidal behavior while housed in administrative confinement.

Further, notes written by these plaintiffs' mental health providers suggested that Vasquez's and Greenwood's depression and behavior were connected to their prolonged terms and conditions of administrative confinement. E.g., dkt. #86-3 (Dr. Callister noting that "most of [Greenwood's] reported symptoms are related to a lengthy segregation stay"); dkt. #86-3 at 2 (Dr. Callister noting that Greenwood was "having difficulty adjusting to what has become a lengthy [administrative confinement].  He has limited coping skills and characterological traits are likely amplified in the isolated environment of seg."); dkt. #76-2 at 6 (Dr. Callister noting that Vasquez's depression appeared to be "largely situational"); id. at 7 (Dr. Callister's memorandum to defendant Braemer stating that Vasquez's depression was "largely situational" and that "his status in administrative confinement is detrimental to him from an emotional standpoint").

That being said, these broad statements from plaintiffs' treating physicians go only so far.  Plaintiffs' doctors did not provide any opinions about what particular conditions of administrative confinement caused plaintiffs' depression to worsen or whether there were certain changes that could be made to the conditions that would have made a difference to plaintiffs' mental health.  The statements in plaintiffs' medical records are vague and conclusory and provide little information about whether it was the social isolation, the limited sunlight, the restricted recreation or the combination of all of these conditions that contributed to Vasquez's and Greenwood's depression.  (Plaintiffs did submit an expert report about the psychiatric effects of prison conditions prepared by Terry Kupers for use in a different case not involving plaintiffs, dkt. #99-1, but Kupers has not been designated

33

as a expert in this case and his report is inadmissible.)  This is important because in order to prove that conditions of confinement in segregation were unconstitutional, plaintiffs must be able to show that changes to those conditions would have made a difference to their mental health.

The Court of Appeals for the Seventh Circuit explained this point in <u>Rice</u>, 675 F.3d 650 (7th Cir. 2012).  In that case, the estate of a pretrial detainee who died while incarcerated brought several claims against jail officials and medical personnel, including a claim that it was unconstitutional to confine the mentally ill detainee in administrative segregation for a prolonged period where he was in extreme isolation and likely to decompensate.  <u>Id.</u> at 666.  The court of appeals affirmed summary judgment in favor of the defendants on the claim because the estate did "not discuss[] in detail what alternative placements were available to the jail nor, more importantly, . . . the differences those placements would have made in terms of [the deceased detainee's] social isolation."  <u>Id.</u> at 667.  To succeed on the claim, the estate was required to "identify feasible alternatives and to tender evidence supporting the contention that [the detainee] likely would have fared better in one of those alternative placements."  <u>Id.</u>  Because it had not done this, the court found summary judgment in the defendants' favor appropriate.

In this case, plaintiffs must adduce evidence that there were feasible alternatives to their conditions and that they would have had fewer serious mental health issues under those alternatives.  Plaintiffs point out that inmates in general population have much greater access to opportunities for social interaction and outside recreation.  This is true, but it is

undisputed that plaintiffs were housed in administrative confinement because they misused their opportunities for social interaction and their behavior made assignment in general population problematic.  Vasquez physically assaulted staff and conspired to incite a riot; Greenwood repeatedly assaulted other inmates; Salazar was a high-ranking gang member who threatened staff and organized pyramid schemes; Lopez attacked another inmate with a padlock in a sock, held a position of authority in a street gang and ordered a hit on another inmate; and Riach repeatedly threatened to injure or kill staff members and used the mail to harass people in the community.  Defendants did not violate plaintiffs' Eighth Amendment rights by deciding that general population was not a feasible alternative.

Plaintiffs suggest that they could have been housed in the behavioral health unit at the prison.  However, there is little evidence in the record about this unit and whether placing plaintiffs in that unit would have been a feasible alternative in light of plaintiffs' conduct history.  Plaintiffs submitted a document with information about the behavioral health unit, dkt. #99-2, but they provided no explanation of the document and more important, no expert testimony about whether placing plaintiffs in that unit would have reduced the likelihood of plaintiffs' mental distress.  In particular, plaintiffs needed to produce evidence showing that particular conditions in administrative confinement (or combination of conditions) exacerbated their mental illnesses, that those same conditions are absent from the behavioral health unit (or another alternative unit of the prison), that it would have been feasible to place plaintiffs in the behavioral health unit or other alternative location and that plaintiffs would have been better off.  Without expert

testimony on this issue, a factfinder could not conclude that such an alternative environment would have made a difference to plaintiffs' mental health.  Rice, 675 F.3d at 667 ("More to the point, the Estate does not explain why placement in the medical ward or any other unit of the jail would have reduced the likelihood of decompensation due to isolation.").

Finally, even if plaintiffs' evidence were sufficient to establish that conditions in administrative confinement exacerbated their mental illnesses and caused them unnecessary suffering and that there were viable alternative housing options or changes that could have been made to administrative confinement that would have prevented their mental and emotional suffering, plaintiffs have not submitted evidence from which a reasonable jury could conclude that defendants knew all of this.  To succeed on an Eighth Amendment claim of deliberate indifference, an inmate must show that the defendant was subjectively aware of and consciously disregarded a substantial risk of serious harm to the inmate.  Farmer, 511 U.S. at 837.  Defendants knew plaintiffs had serious mental health needs.  Also, despite defendants' arguments to the contrary, I can assume that defendants knew that prolonged confinement in the segregation unit *could* cause inmates to experience depression and emotional suffering and could aggravate existing mental illnesses.  As the court of appeals has noted, "[t]here is an extensive literature on the effect of such conditions, particularly of isolation, on mentally disturbed prisoners," Scarver v. Litscher, 434 F.3d 972, 975 (7th Cir. 2006), and defendants have received information on this issue in other lawsuits involving the affects of segregation on mentally ill prisoners.  E.g., Schumacher v. Frank, 08-cv-228-slc; Matz v. Frank, 08-cv-491-slc; Matz v. Frank, 09-cv-653-slc.

36

However, defendants can be held liable only if they knew the conditions of administrative confinement posed a substantial risk of causing *these* plaintiffs serious physical or mental suffering. <u>Farmer</u>, 494 F. Supp. 2d at 368-70 (although prison officials knew plaintiff had serious mental health condition that could be affected negatively by segregation, plaintiff had not shown that defendants drew inference that transferring plaintiff to segregation posed "substantial risk of serious harm"). There is no evidence that defendants believed that the conditions of administrative confinement were inappropriate for *all* inmates with serious mental illness or for plaintiffs in particular. <u>Id.</u> at 369-70 ("memo and general knowledge of the mental health issues engendered by placement at [adjustment center] [do not] establish deliberate indifference on the part of the confining defendants in this case"). The possibility that defendants could or should have drawn this inference from previous cases or from plaintiffs' own behaviors is not sufficient to meet the standard of deliberate indifference.

In <u>Scarver</u>, 434 F.3d at 975-77, the court of appeals considered whether defendants committed an Eighth Amendment violation by housing Scarver, a seriously mentally ill prisoner, in a Supermax institution, the conditions of which caused Scarver severe mental distress. The court explained that although defendant officials "[p]robably . . . should have known" that transferring a mentally ill inmate to a Supermax facility would have put him "at risk of severe distress," "that would make them guilty merely of negligence and not of deliberate indifference (the mental state required to establish an Eighth Amendment violation), which would require proof that they were conscious of the risk." <u>Id.</u> at 975

37

(citing <u>Farmer</u>, 511 U.S. at 837-38).  The court of appeals concluded there was no evidence of deliberate indifference because there was "no evidence . . . that defendants knew . . . that [Scarver] would be at risk of severe distress" and "no indication that they attributed [his subsequent distress] to the heat of the cell, the constant illumination of the cell, or the denial of audiotapes or similar equipment—no evidence in short that they realized the harm that the conditions of his confinement were inflicting on him."  <u>Id.</u>  <u>See also</u> <u>id.</u> at 977 (Scarver "failed to cite evidence to overcome the defendants' denials that they knew these conditions were making his mental illness worse.").

Similarly, in this case, there is no evidence that defendants attributed plaintiffs' mental health issues to the conditions of administrative confinement.  There is no evidence that plaintiffs Salazar, Riach, Lopez or Greenwood ever told defendants specifically that their conditions of confinement were exacerbating their mental illness or causing them severe mental distress.  Further, although plaintiff Vasquez did write to defendants about the effect of his conditions of confinement on his mental illness, there is no evidence that defendants believed Vasquez was at serious risk of harm.  Rather, the evidence suggests that defendants believed Vasquez did not want to be in segregation, but that he needed to be there for the security of the prison.  Defendants knew Vasquez was not a mental health professional, and they were not required to believe his statements about the cause of his depression and suicidal thoughts.  As the court of appeals has explained, prison officials are not required to believe everything inmates tell them, <u>Knight v. Wiseman</u>, 590 F.3d 458, 466 (7th Cir. 2009); <u>Lindell v. Houser</u>, 442 F.3d 1033, 1035 (7th Cir. 2006), even when the topic is

38

mental health or suicide. <u>Domino v. Texas Department of Criminal Justice</u>, 239 F.3d 752, 756 (5th Cir. 2001). Vasquez was ultimately released from administrative confinement after his psychiatrist, Dr. Callister, recommended that he be moved to a less restrictive environment.

Finally, plaintiffs have adduced no evidence suggesting that defendants were indifferent to the distress plaintiffs experienced. Defendants have averred that they believed plaintiffs' needs were being adequately addressed by the psychiatric and psychological services units and it is undisputed that all plaintiffs received medication and other treatment for their mental health needs and that some even participated in group therapy. When plaintiffs Vasquez and Greenwood engaged in suicidal behavior, they were placed on observation. Plaintiffs have not adduced evidence showing that they could not obtain psychiatric or psychological care or that defendants interfered with their access to mental health care or the treatment prescribed by professionals. As non-medical professionals, defendants were permitted to defer to the judgment of medical professionals regarding treatment of plaintiffs' mental illnesses. <u>Rice</u>, 675 F.3d at 676; <u>Arnett v. Webster</u>, 658 F.3d 742, 755 (7th Cir. 2011); <u>Johnson v. Doughty</u>, 433 F.3d 1001, 1011 (7th Cir. 2006). Certainly, defendants could not ignore obvious incompetency on the part of treating psychiatrists or psychologists and could not ignore an inmate in obvious distress, but plaintiffs have adduced no evidence suggesting that there was any reason for defendants to believe that plaintiffs were receiving inadequate mental health care.

Plaintiffs contend that whether they received treatment for their mental health issues

is a separate question from their claim that the conditions of confinement exacerbated their mental health problems.  However, the court of appeals' decision in Scarver, 434 F.3d at 975, suggests that an inmate's access to psychiatric treatment is highly relevant.  In that case, the defendants were aware that Scarver was in serious distress because of his mental illness. Id.  However, the court concluded that the defendants had not committed a constitutional violation because, in part, "[t]hey were not indifferent to his welfare.  They gave him constant psychiatric attention, plied him with antipsychotic medication, and through close surveillance thwarted his two suicide attempts.  They did not know what more to do."  Id. See also Farmer, 494 F. Supp. 2d at 369-70 ("As [plaintiff's] mental health problems manifested themselves during her incarceration at [the adjustment center], the problems were responded to, in the form of meetings with psychologists, medication, and placement in a mental hospital at one point, suggesting that [the adjustment center] officials did not disregard whatever risk the conditions of confinement posed to her mental health or sanity.").  In this case, although defendants did not change the conditions of administrative confinement, they provided mental health treatment to plaintiffs in an effort to help them cope with the conditions.  Changing the conditions might have helped plaintiffs' mental and emotional state more than the psychiatric medications did, but federal courts can not assume they know better than prison staff how to manage mentally ill inmates and cannot impose managerial requirements on prisons unless there has been a constitutional violation.  Because plaintiffs have not shown that defendants violated their constitutional rights, plaintiffs are not entitled to relief.

ORDER

IT IS ORDERED that

1.  The motions filed by plaintiffs Luis Vasquez, David Greenwood, Javier Salazar, Julian Lopez and Anthony Riach to "stay briefing on motion for summary judgment and motion to compel," dkt. #67, and "for assistance in recruiting counsel and motion to appoint expert," dkt. #68, are DENIED.

2.  Plaintiffs' motions for leave to file a sur-reply, dkt. ##89, 98, are GRANTED.

3.  The motion for summary judgment, dkt. #56, filed by defendants Daniel Braemer, William Pollard, Donald Strahota, Michael Thurmer and Pamela Zank is GRANTED.

4.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 13th day of August, 2013.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

41